# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| NAKESHA BURGE, ) | |
| ) | CASE NO.    1:07-cv-01364 |
| Plaintiff, ) | |
| ) | |
| v. ) | MAGISTRATE JUDGE VECCHIARELLI |
| ) | |
| MICHAEL J. ASTRUE, ) | |
|   Commissioner of Social Security ) | **MEMORANDUM OPINION & ORDER** |
| ) | |
| Defendant. ) | |

Plaintiff Nakesha Burge ("Burge") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Burge's claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq*.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, this Court VACATES and REMANDS the final decision of the Commissioner for further proceedings consistent with this opinion.

### I. Procedural History

On September 23, 2002, Burge filed an application for SSI alleging a disability onset date of March 1, 2000 and claiming that she was disabled due to narcolepsy and depression.  Her application was denied initially and upon reconsideration.  Burge timely requested an administrative hearing.

On November 16, 2004, Administrative Law Judge Steven H. Templin ("ALJ") held a hearing during which Burge, represented by counsel, testified.  Seymour Leberman testified as the Medical Expert ("ME") and Nancy Borgeson appeared as the Vocational Expert ("VE") but did not testify.  On January 11, 2006, the ALJ found Burge was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.  Burge filed an appeal to this Court.

On appeal, Burge claims the ALJ erred by: (1) relying on suspicions, impermissible inferences, and evidence outside the record; (2) finding Burge was not credible; and (3) finding that Burge had the residual functional capacity ("RFC") to engage in substantial gainful employment.

### II. Evidence

*Personal and Vocational Evidence*

Born on December 21, 1978 and age twenty-five (25) at the time of her administrative hearing, Burge is a "younger" person.  *See* 20 C.F.R. § 416.963(c).  Burge has high school equivalent education (GED) and had performed some short-term jobs in the past as a cashier, telemarketer, assembly worker, and sales associate.

*Medical Evidence*

On July 29, 2002, Mansoor Ahmed, M.D., of the Southwest Cleveland Sleep Center, evaluated Burge's complaints of excessive sleepiness. (Tr. 99-100.) Dr. Ahmed reported that Burge complained of severe daytime sleepiness, inability to stay awake during the day, and falling asleep while driving. (Tr. 99.) He noted that Burge had been diagnosed with low blood sugar by her primary care physician, but had not followed up. *Id*. Burge claimed to sleep twelve to thirteen hours per day over the past two or three years. *Id*. Dr. Ahmed recommended an overnight sleep study to determine the severity of her symptoms. (Tr. 100.)

On August 23, 2002, Burge underwent Multiple Sleep Latency Testing (MSLTS) to evaluate her sleepiness and rule out narcolepsy. (Tr. 97-98.) Dr. Ahmed reported that Burge's sleep study was unremarkable for sleep apnea (Tr. 98.) Dr. Ahmed stated that the testing confirmed Burge's diagnosis of narcolepsy, a rare sleep disorder. (Tr. 98.) Dr. Ahmed provided sleep hygiene instructions to Burge, and prescribed Provigil medication to improve her symptoms. *Id*.

On August 30, 2002, Dr. Ahmed reported that he had seen Burge at his clinic for symptoms of severe daytime sleepiness. (Tr. 96.) Dr. Ahmed opined that Burge had the classic symptoms of narcolepsy. *Id*. Dr. Ahmed prescribed Ritalin and provided Burge with sleep hygiene instructions. *Id*. Dr. Ahmed noted that an important component of narcolepsy treatment was sleep hygiene and adequate sleep. *Id*.

On November 23, 2002, Roy W. Starkey, M.D., a state agency physician, reviewed Burge's medical records and completed a Physical RFC Assessment. (Tr. 102-06.) Dr. Starkey indicated that Burge had no exertional limitations, but noted Burge had a diagnosis of narcolepsy

treated with Ritalin. (Tr. 103.) Dr. Starkey found that Burge should never climb ladders, ropes, or scaffolds. (Tr. 104.) He further found that Burge should avoid all exposure to hazards such as machinery and heights. (Tr. 105.)

On March 25, 2003, Rebecca Neiger, M.D., a state agency physician, reviewed Burge's updated medical records and affirmed Dr. Starkey's RFC assessment. (Tr. 106.)

On March 14, 2005, Herschel Pickholtz, Ph.D., a psychologist, examined Burge upon a referral from the Bureau of Disability Determination. (Tr. 108-16.) Burge told Dr. Pickholtz that she was unable to work and was terminated from her last job for falling asleep. (Tr. 108.) Burge reported that she continued to fall asleep during the day despite her medications. *Id*. Her daily activities included getting her son ready for school, washing laundry, and checking her son's homework, with periods of intermittent sleep between them. (Tr. 109.) Dr. Pickholtz reported that Burge had average to low average ranges of intellectual functioning, based on a Wechsler Adult Intelligence Scale III test. (Tr. 111.) Dr. Pickholtz believed that Burge's test results may have been adversely affected by her tendency to become tired and close her eyes during testing. (Tr. 112.) Dr. Pickholtz diagnosed narcolepsy and mild to moderate depression. (Tr. 113.) Dr. Pickholtz found that Burge's ability to relate to co-workers, from a psychological perspective, fell within the lower end of average range. (Tr. 114.) Her overall abilities to attend and remember work-related activities fell within the mild range of impairment due to her lethargy and narcolepsy. *Id*. Burge had slight restrictions in understanding and carrying out simple and detailed instructions, related to narcolepsy. (Tr. 115.) Dr. Pickholtz also noted slight restrictions in Burge's ability to interact with the public, supervisors, and coworkers, and in her ability to respond appropriately to work pressures and changes in routine. (Tr. 116.)

*Hearing Testimony*

At the hearing, Burge testified to the following.  She did not have problems falling asleep but rather slept too much.  (Tr. 145-46.)  She sleeps throughout the day.  (Tr. 146.)  At the time of the hearing, she lived with her mother and had not lived on her own since she began suffering from narcolepsy.  *Id*.  When she fell asleep during the day, she would sleep anywhere from half an hour to two hours.  (Tr. 147.)  On average, she would fall asleep between six to seven times a day.  *Id*.  She has fallen asleep while eating, while driving, and while in the middle of a conversation.  (Tr. 148.)   She stated that she also suffers from cataplexy, which is a side effect of narcolepsy.  (Tr. 149.)  She also suffers from hallucinations.  (Tr. 151.)  Two of her children live with their father while another child lives with Burge and her mother.  (Tr. 153-54.)  She testified that she did not see Dr. Ahmed for two years because she did not have transportation and that her "medical doesn't pay for specialists."  (Tr. 155.)  She stated that she still falls asleep during the day despite taking medication.  (Tr. 155-56.)  She further testified that her narcolepsy has made her depressed because she has "no life."  (Tr. 158.)

The ME testified to the following.  There was sufficient information in the record to allow him to form opinions concerning Burge's medical conditions for purposes of disability evaluation.  (Tr. 142.)  However, the ME then stated that the records since Burge's application on  September 23, 2002 were too sparse to determine how Burge's impairments would affect her ability to be employed.  (Tr. 142-43.)  He opined that the diagnosis of narcolepsy had been established but was unable to determine how often she was afflicted with daytime somnolence.  (Tr. 143.)  The ME stated Burge had taken a number of stimulant-type medications for narcolepsy.  *Id*.  To his knowledge, Burge had not received any medication to induce nocturnal

sleep. (Tr. 144.) Reviewing Burge's sleep study, the ME stated that her sleep efficiency was ninety-one (91) percent, which is "fairly good." *Id*. The ME further stated that there was no documented response concerning Burge's response to treatment. *Id*. Burge did not have any documented visits to a treating doctor between August 30, 2002 and October 16, 2004. (Tr. 144-45.) The ME testified that he does not know of any cure for narcolepsy. (Tr. 156.) He stated that there was nothing unusual about Burge's testimony, including the frequency of sleep attacks and cataplexy. *Id*. The ME stated that people who suffer from narcolepsy have no control over when they fall asleep. (Tr. 157.)

### III. Standard for Disability

A claimant is entitled to receive SSI benefits under the Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.[1]

---

[1] The entire five-step process entails the following: First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent her from doing her

### IV. Summary of Commissioner's Decision

The ALJ found Burge established at least one medically determinable, severe impairment, but her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ did not specify exactly what constituted Burge's severe impairment, though he opined that Burge suffered from narcolepsy and depression at all times material to the decision. (Tr. 18, 21.) It is unclear whether Burge engaged in any past work activities, but she has a Residual Functional Capacity ("RFC") for a limited range of work at all exertional levels. (Tr. 21-22.) The ALJ then used the Medical Vocational Guidelines ("the grid") to determine that Burge is not disabled.

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

---

past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI. Analysis

Burge claims the ALJ erred by: (1) relying on suspicions, impermissible inferences, and evidence outside the record; (2) finding Burge was not credible; and (3) finding that Burge had the residual functional capacity ("RFC") to engage in substantial gainful employment. The Commissioner's brief is largely unresponsive to Burge's first two arguments. The Commissioner makes (1) no attempt to rebut Burge's argument that the ALJ made legally impermissible inferences and relied upon evidence not in the record and (2) only a nominal attempt to rebut the argument that the ALJ failed to make a proper credibility finding compliant with SSR 96-7p. (Def.'s Br. at 8-12.)

An ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). While an ALJ's credibility findings are entitled to considerable deference, they are not entitled to absolute deference and "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Storey v. Comm'r of Soc. Sec.*, 1999 U.S. App. LEXIS 8357 (6th Cir. 1999)  As such, the ALJ must provide a reviewing court with his or her reasons for the credibility finding. To determine credibility, the ALJ must look to medical evidence, statements by the individual, other information provided by treating and examining physicians, and any other relevant evidence on the record. *See* SSR 96-7p, Purpose. Beyond medical evidence, there are seven factors that the ALJ should consider.[2] The ALJ need not analyze all seven factors, but

---

[2] The seven factors are: (1) the individuals daily activities; (2) the location, duration, frequency, and intensity of the individual's symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual

should show that he considered the relevant evidence.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).  "The determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96-7p, Purpose; *see also Felisky v. Bowen,* 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"); *Cross*, 373 F. Supp. 2d at 733 (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the

The ALJ repeatedly referred to the medications used to treat narcolepsy, Ritalin and Provigil.  (Tr. 16-17, 19.)  On each occasion, the ALJ made inaccurate statements or unreasonable inferences that tended to impugn Burge's credibility.  First, the ALJ characterized Burge's testimony that the doctor increased the dosage of her medications despite her report of headaches as "illogical."  (Tr. 16.)  A review of Burge's hearing testimony shows that, while she did complain of headaches associated with her medication, she stated her dosage increased after she told the doctor that "[her] body had gotten immune" to the lesser dosage.  (Tr. 155.)  There is nothing illogical about this testimony.  The ALJ also appeared skeptical that Burge was taking Provigil after she previously "refused" to take it.  (Tr.  17.)  The record does not support such a

---

takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p, Introduction; *see also Cross v. Comm'r of Soc. Sec.*, 375 F. Supp. 2d 724, 732 (N.D. Ohio 2005).

refusal, as Dr. Ahmed merely noted that Burge "prefers" Ritalin over Provigil "because of problems with birth control pills."[3] The ALJ also suggests that Burge's stated reason for discontinuing Ritalin – that it was ineffective – was "plausible, [but] the credible reason why she did not continue to take it was because it was not prescribed by a sleep specialist." (Tr. 19-20.) The ALJ's stated reason for not believing Burge's testimony in this regard is pure conjecture, not founded on any evidence of record, and amounts to an unreasonable inference. Finally, the ALJ observed that both Ritalin and Provigil are controlled substances but failed to explain the significance of this observation. (Tr. 20.)

Even more troubling, the ALJ proffered his own psychological diagnosis of Burge without pointing to any substantiating evidence of record. In fact, although the ALJ characterized Burge as suffering either from a borderline or dependent personality, he conceded that neither the ME nor Dr. Ahmed shared this view.[4] (Tr. 18.) Despite the fact that the ALJ's diagnosis was not based on any evidence of record, the ALJ used his fabricated diagnosis to discredit the accuracy of Burge's testimony. (Tr. 18.)

The Commissioner's decisions must be based on testimony and medical evidence in the

---

[3] Provigil, also known by the generic name Modafinil, "is a stimulant drug used to treat unusually sleepy people who have been diagnosed with narcolepsy, obstructive sleep apnea/hypopnea syndrome, or shift work sleep disorder." *See Physicians' Desktop Reference* (Thomson Healthcare 2008), *available at* http://www.pdrhealth.com/home/home.aspx. Provigil users are warned that use of the medication renders oral contraceptives less effective. *Id.* Given the ALJ's marked emphasis of the fact that Burge has three children, the first of which was born when she was around fifteen, her concern about the effects of Provigil on birth control is not irrational. (Tr. 18.)

[4] Dr. Ahmed's record stated that Burge was "[n]oted for depression and personality changes." (Tr. 98.) The ME only testified that there is some "psychologic aspect" to Burge's condition, though he did not speculate whether it was the result of Burge's narcolepsy or a cause of it. (Tr. 157-58.)

record, and "[t]he ALJ cannot make his own independent medical determinations about the claimant." *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985), *citing Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982); *accord Tucker v. Sullivan*, 1992 U.S. Dist. LEXIS 11554 (D. Kan. 1992). Persons suffering from borderline personality feel they are "entitled to nurturance" and are "relentless seekers of care;" persons suffering from a dependent personality "surrender responsibility for major areas of their lives to others." THE MERCK MANUAL (17th ed. 1999). The ALJ's inappropriate attempt to employ his own unfounded diagnosis to undermine Burge's credibility is reversible error.

  The Commissioner attempts to argue that the ME's testimony supported the ALJ's finding that Burge's testimony concerning her symptoms was not fully credible. (Def.s' Br. at 9.) This argument lacks merit. First, the ME unequivocally stated that there was nothing unusual about Burge's description of her episodes of daytime sleeping. (Tr. 156.) In fact, the ME opined that Burge's testimony was a "typical description" of the effects of narcolepsy. (Tr. 157.) Although the ME testified that the medical record was sparse and that there was no statement from a medical source detailing Burge's limitations, this testimony alone is an insufficient basis to reject Burge's statement of her symptoms. *See* 20 C.F.R. § 404.1529(c)(3) ("[W]e will not reject your statements about the intensity and persistence of your ... symptoms or about the effect your symptoms have on your ability to work *solely* because the available objective medical evidence does not substantiate your statements.") (emphasis added); *accord Storey*, 1999 U.S. App. LEXIS 8357 at *8. In addition, the lack of a medical statement corroborating the frequency of Burge's episodes of falling asleep during the day is not surprising because no doctor would be in a position to observe Burge throughout the course of an

11

entire day.  Notably, Dr. Pickholtz examined Burge after the hearing and personally observed her "almost falling asleep" on "multiple occasions" during the examination and "had to wake her up or at least talk to her in order to bring her back to focus."  (Tr. 112.)

Viewing the ALJ's opinion as a whole and the combined effect of his above cited statements, it appears the ALJ found that Burge was not credible on the basis of an inaccurate characterization of the record, unexplained innuendo, and his own unsubstantiated medical diagnosis.  Thus his credibility determination was not supported by substantial evidence and he failed to comply with the regulations governing disability determinations.  Therefore, this case will be remanded so that the ALJ may conduct a proper and objective credibility analysis that is based on accurate citations to the record and devoid of impermissible inferences or unsubstantiated findings.

In addition, the ALJ's finding concerning the extent of Burge's limitations is not adequately explained.  The ALJ was "not convinced that the claimant's impairments have resulted in the frequency and duration of intense symptoms that the claimant has alleged."  (Tr. 18.)  However, the ALJ's opinion does not explain his ultimate finding concerning Burge's major *nonexertional* limitation – her allegedly uncontrollable habit of falling asleep numerous times during day due to narcolepsy.[5]  (Tr. 18.)  It is unclear whether the ALJ found that her allegation that she fell asleep six to seven times daily was exaggerated, whether he disbelieved the length of time she slept during such episodes, whether he doubted her inability to control

---

[5] Nonexertional impairments are "impairments affecting mental, visual, auditory, and speech functions [and] also include impairments affecting climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, and use of the fingers for fine activities."  *Bullock v. Sec'y of Health & Human Servs.*, 902 F.2d 32 (6th Cir. 1990) ("In other words, nonexertional limitations concern mental, sensory, or environmental limitations.").

when and where she feel asleep, or whether he believed she *never* experienced episodes of uncontrollable daytime sleep on a daily or weekly basis.

While the Court does not require a perfect opinion, it does ask for a logically consistent one.  *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("we cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544-546 (6th Cir. 2004) (finding it was not harmless error for the ALJ to fail to make sufficiently clear why he rejected the treating physician's opinion, even if substantial evidence not mentioned by the ALJ may have existed to support the ultimate decision to reject the treating physician's opinion).

It is thoroughly unclear from the ALJ's opinion whether his RFC finding incorporated Burge's episodes of uncontrolled daytime sleep or whether he found that she did not suffer from any such episodes on a regular basis.  Where a claimant's impairment does not limit exertion, the first issue is the extent to which a claimant's ability to work the entire exertional span is reduced by the effects of the nonexertional impairment, as "this may range from very little to very much, depending on the nature and extent of the impairment(s).  In many cases, a decisionmaker will need to consult a vocational resource."  SSR 85-15;  *Alderete v. Barnhart*, 114 Fed. Appx. 353, 357 (10th Cir. 2004) *citing Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993) (resort to the Grids is inappropriate when evaluating nonexertional limitations such as pain and mental impairments); *Cole v. Sec'y of Health & Human Servs.*, 820 F.2d 768, 772 (6th Cir. 1987).

Herein, the ALJ expressly relied on the grids in crafting his decision despite the potential presence of an uncommon impairment not easily susceptible to conventional categorizations.

The Commissioner's argument that the ALJ's reliance on the grids was appropriate is not well taken. Pursuant to 20 C.F.R. Pt. 404, Subpt. P, App.2 § 204.00, "[e]nvironmental restrictions *ordinarily* would not significantly affect the range of work existing in the national for individuals with the physical capability for heavy work." (Emphasis added). Uncontrolled episodes of daytime sleeping, as is common among those with narcolepsy, is hardly an ordinary limitation. The ALJ's reliance on the grids was unreasonable, as his decision did not adequately address Burge's non-exertional limitations if, in fact, she routinely could be expected to fall asleep on the job. Because the ALJ would have been required to enlist the services of a VE if Burge had a nonexertional impairment that caused uncontrolled episodes of daytime sleep, the ALJ's duty to clearly articulate his finding with respect to this impairment becomes even more indispensable.[6]

Upon remand, the ALJ must clearly explain his findings with respect to Burge's alleged episodes of uncontrolled daytime sleep. If the ALJ finds that such a nonexertional impairment existed, he cannot solely rely on the grids to determine Burge's RFC, but shall conduct a new hearing and enlist the services of a VE to determine the effect of such an impairment on Burge's employability.

### VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner failed to comply with proper legal standards and not supported by substantial evidence. Accordingly, the decision of the Commissioner is VACATED and the case is REMANDED for further

---

[6] Vocational experts routinely testify about whether individuals who must be absent from work for a specific number of days each month are employable. Thus, VE testimony about whether a person who consistently falls asleep on the job due to narcolepsy is employable would be relevant to the claimant's RFC.

proceedings consistent with this opinion.

     IT IS SO ORDERED.


                                      <u>/s/ Nancy A. Vecchiarelli</u>
                                       U.S. Magistrate Judge

Date: February 27, 2008